## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| LARRY JAMES ("JAMIE") SMITH, | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | Case No. 4:18-cv-00074-ALM |
| | § | Jury |
| | § | |
| | § | |
| KIMBERLY-CLARK CORPORATION, | § | |
| *Defendant*. | § | |
| | § | |

### FIRST AMENDED COMPLAINT [1]

Plaintiff Larry James ("Jamie") Smith sues Defendant Kimberly-Clark Corporation ("KC")

for violating federal law. In support, Smith shows the following:

### Nature of the Case

1.      This is an employment discrimination case.

2.      This case involves a discharge.

3.      This case about race. Smith, whose race is white, alleges that his race was a

motivating factor in KC's decision to fire him. Specifically, and as KC already knows, KC has had

racial incidents at this location in the past. KC cynically used the events that gave rise to this suit

(a) to mischaracterize, intentionally, as an incident that is racial in nature when it is not, and then

(b) to trumpet the fact that it took prompt, remedial action – namely, by firing an employee who

is white -- which KC can now display like a trophy should any subsequent episodes occur at this

location.

---

[1] Plaintiff files this document in compliance with the *Memorandum Opinion and Order* (Dkt. #28)
at p. 9.

**First Amended Complaint**                                                          **Page 1**

A.      To reach the result it desired, and as shown below, KC did much, much more than investigate improperly or reach the wrong conclusion.

4.      In Count One, Smith brings a claim for race discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

A.      In Count One, Smith makes factual averments that satisfy the *prima facie* elements under McDonnell-Douglas. See paragraph 118 *infra.*

5.      In Count Two, Smith brings an alternative claim for race discrimination in violation of Section 703 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII").

A.      In Count Two, Smith makes factual averments that satisfy the *prima facie* elements under McDonnell-Douglas. See paragraph 123 *infra.*

## Parties

6.      Plaintiff Larry James ("Jamie") Smith is an individual. Smith currently resides in Lamar County, Texas.

7.      Defendant Kimberly-Clark Corporation ("KC") is a Delaware corporation. It is currently in good standing. It has already appeared in this action. *See Defendant's M. to Dismiss the Compl. of Pl. Larry James Smith* (Dkt. #12), filed on 03.29.18.

## Jurisdiction

8.      This Court has original, subject-matter jurisdiction over this action because Smith's claims present federal questions. *See* 28 U.S.C. §1331 ("federal question").

9.      This Court has personal jurisdiction, both specific and general, over KC because --

A.      KC conducts business in Texas;

B.      KC's corporate headquarters is located n Texas;

C.      The events giving rise to Smith's two claims arose in Texas; and,

D.      KC is amenable to service by this Court.

## Venue

10.     Venue is proper in this judicial district and division because a substantial part of the events or omissions giving rise to Smith's claims occurred here. *See* 28 U.S.C. §1391(b)(2).

## Material Facts

11.     KC is a publicly-traded company (NYSE: KMB).

12.     KC is ranked Number 163 on the 2017 Fortune® 500 list.

13.     KC currently has more than 501 employees working in the United States.

14.     KC had more than 501 employees working in the United States throughout all of calendar year 2017.

15.     KC had more than 501 employees working in the United States throughout all of calendar year 2016.

16.     In a press release dated January 23, 2018, KC stated that it "and its well-known global brands are an indispensable part of life for people in more than 175 countries."

17.     In its 2016 Annual Report on SEC Form 10-K, KC described its business, in part, as follows: "[KC] ... [is] a global company focused on leading the world in essentials for a better life through product innovation and building our personal care, consumer tissue and K-C Professional brands."

18.     According to the same 10-K referenced in paragraph 17, KC is "organized into" three "operating segments based on product groupings," one of which KC calls "personal care."

19.     KC currently operates more than a dozen of what it calls "principal production facilities" in the United States.

20.     One of the principal production facilities referenced in paragraph 19 is located at

2466 FM 137 in Paris, Texas 75460 (hereinafter "Paris Plant").

21.     The Paris Plant makes huggies brand diapers (sizes newborn through size six), huggies brand pull-ups, and training pants.

22.     KC has been operating the Paris Plant without interruption from at least the mid-eighties to the present.

23.     KC has been operating the Paris Plant without interruption from at least October 2007 to the present.

24.     According to KC's employment records, Smith's race is "White" or "Caucasian."

25.     KC hired Smith in November 2007.

26.     Smith's effective date of hire at KC is November 5, 2007.

27.     KC fired Smith.

28.     KC replaced Smith with an employee who, according to KC's records, is outside Smith's protected group, *i.e.,* the employee with whom KC replaced Smith is not "White" or "Caucasian."

29.     KC treated Smith less favorably than other similarly-situated employees who are outside the protected group, *i.e.,* employees who, according to KC's records, are not "White" or "Caucasian."

30.     As shown by documents it has already produced in this action, KC has tampered with and/or falsified at least some of the supposed "evidence" upon which it claims to have based its decision to discharge Smith.

31.     KC no longer employs the individual who, on KC's behalf, supposedly adduced at least some of the supposed "evidence" upon which KC claims to have based its discharge decision.

32.     KC deviated from its normal policies and procedures by failing to deliver to Smith

the personal effects which Smith kept in the locker at the Paris Plant issued to him by KC.

      A.     The locker that KC assigned to Smith did not have a number. Instead, the locker had Smith's name on it.

33.     KC fired Smith effective the first week of November 2017.

34.     It was on November 3, 2017 when KC told Smith it had decided to fire him.

35.     It was a certain Mr. Greg Smith who, on behalf of KC, told the Plaintiff, Mr. Larry Smith, that he was fired.

      A.     Mr. Greg Smith is no longer employed with KC.

      B.     Mr. Greg Smith ended his employment with KC in 2018.

      C.     Mr. Greg Smith ended his employment with KC in May 2018.

36.     Other than the discharge referenced in paragraph 27 *supra*, KC issued zero write-ups to Plaintiff Larry Smith from January 1, 2013 to the effective date of Smith's discharge.

37.     Smith's employee number was B84139 during at least the last five years of his employment with KC.

38.     At all times from October 1, 2017 to the end of his employment with KC --

      A.     KC employed Smith as an "asset process operator" or "APO."

      B.     KC paid Smith a regular rate of pay of $22.50 per hour.

      C.     KC classified Smith as someone who was eligible to receive overtime pay.

      D.     KC sometimes paid Smith overtime pay.

      E.     KC sometimes paid Smith a "safety bonus."

      F.     If KC did pay Smith a "safety bonus," the bonus was for a particular month.

      G.     If KC did pay Smith a "safety bonus," the gross amount was on/about $200.

      H.     KC made available to Smith, and Smith actually participated in, a plan of

health insurance.

    (1)    Smith was a named insured in this plan.

    (2)    Smith's wife was covered by this plan.

    (3)    Smith's children were covered by this plan.

        (i)    Smith has three children who are all covered by this plan.

    I.    KC made available to Smith, and Smith actually participated in, a 401(k) plan.

    (1)    Smith participated in this plan.

    (2)    Smith made periodic contributions to this plan.

        (i)    The amount of Smith's contribution was 5% of Smith's pay.

    (3)    KC made periodic contributions to this plan for Smith's benefit.

    (4)    KC made periodic matching contributions to this plan for Smith's benefit.

        (i)    The amount of KC's periodic matching contribution was "dollar-for-dollar."

39.    Smith worked at the Paris Plant on Friday, October 13, 2017. According to his computerized time card, Smith reported to work at about 6:30 p.m.

40.    At about midnight on Friday, October 13, 2017, Smith was working the back, a/k/a "fluff end" of the machine at P6 of the Paris Plant.

41.    At about midnight on Friday, October 13, 2017, there was a desk at the back, a/k/a "fluff end" of the machine at P6 of the Paris Plant.

42.    The desk referenced in paragraph 41 *supra* is used by the machine operator.

43.    At about midnight on Friday, October 13, 2017, it was Smith who was the machine

operator and, thus, was using the desk referenced in paragraph 41 *supra*.

44.     At about midnight on Friday, October 13, 2017, KC had one or more surveillance cameras present at the back, a/k/a "fluff end" of the machine at P6 of the Paris Plant.

45.     At about midnight on Friday, October 13, 2017, Smith was at the back, a/k/a "fluff end" of the machine at P6 of the Paris Plant, and Smith had a "helper" with him.

46.     The first name of the "helper" referenced in paragraph 45 *supra* was "Alyssa."

47.     The race of the helper referenced in paragraph 45 *supra* is **not** "White" or "Caucasian."

48.     On October 13, 2017, KC was aware that the race of the helper referenced in paragraph 45 *supra* is not "White" or "Caucasian."

49.     As of the filing of this First Amended Complaint, KC is aware that the race of the "helper" referenced in paragraph 45 *supra* is not "White" or "Caucasian."

50.     The surname of the "helper" referenced in paragraph 45 *supra* was "Thoms."

51.     The "helper" referenced in paragraph 45 worked at the Paris Plant as a "temp."

A.      On Friday, October 13, 2017, KC had an on-site temp service at the Paris Plant. The name of this temp service was called, in part, "Holman."

52.     At about midnight on Friday, October 13, 2017, Alyssa talked to Smith.

53.     At about midnight on Friday, October 13, 2017, Alyssa told Smith she had accidentally detached some string to a fan.

54.     At about midnight on Friday, October 13, 2017, Alyssa told Smith she was afraid she would get in trouble for having detached some string to a fan.

55.     At about midnight on Friday, October 13, 2017, Alyssa asked Smith if he would re-attach the detached string to the fan for her.

56.     Smith told Alyssa yes, he would re-attach the detached string to the fan for her.

57.     Sometime after Alyssa's request to Smith, referenced in paragraph 55 *supra*, certain machines at the Paris Plant for which Smith was responsible began experiencing problems.

    A.     The on-board computers of the machines for which Smith was responsible have so-called "mach logs."

        (1)     These mach logs document repairs to those machines.

58.     Sometime after Alyssa's request to Smith, referenced in paragraph 55 *supra*, certain machines at the Paris Plant for which Smith was responsible began experiencing problems, with the result that Smith began focusing his attention on those problems and not on the string that Alyssa had detached from a fan.

59.     Smith left the detached string referenced in paragraph 53 *supra* lying on the desk referenced in paragraph 41 *supra*.

60.     Smith left the detached string referenced in paragraph 53 *supra* in a horizontal position on the desk referenced in paragraph 41 *supra*.

61.     Smith went home at the end of his shift.

    A.     Smith's shift ended at 6:30 a.m. on Saturday, October 14, 2017.

62.     At about 6:25 p.m. on Saturday, October 14, 2017, Smith was going into the Paris Plant for his night shift. As Smith was doing this, a co-worker named Mr. Terry Beard waved at him, and Smith came over to Beard to talk. Beard and Smith were in a hallway at the Paris Plant.

63.     Beard and Smith then had the following conversation.

    A.     Beard asked Smith if he, *i.e.,* Smith, knew anything about "the noose in the back of our machine."

    B.     At first, Smith did not know what Beard was talking about.

**First Amended Complaint**                                                                                    **Page 8**

C.      Then, Smith wondered if Beard was talking about the detached string he had tried to re-attach to a fan for Alyssa.

D.      Smith then asked Beard if Beard was talking about some string.

E.      Beard responded to subpart "D" by shrugging his shoulders, which Smith took to mean that Beard did not know.

F.      Beard then told Smith, among other things, that "HR [referring to 'Human Resources'] will probably be investigating."

G.      Beard also told Smith, among other things, that "they" – presumably, "they" referred to HR – "even took pictures" of this "noose."

(1)      Beard used the plural ("pictures").

64.      Smith was scheduled off on Sunday, October 15, 2017, and he did not appear for work.

65.      Smith was scheduled off on Monday, October 16, 2017, and he did not appear for work.

66.      Smith was not at work at the Paris Plant at any time from October 17, 2017 through October 22, 2017.

A.      During this time Smith was on a pre-approved, excused absence.

67.      Smith returned to work on Monday, October 23, 2017. From that date through Sunday, October 29, 2017, KC had Smith attend a training class, the subject of which was how to use a new machine called a "Maui" machine.

68.      At about 2:00 p.m. on October 26, 2017, Smith visited with his Team Leader, Mr. Tim Darnell. The following took place during this conversation.

A.      First, Smith told Darnell about the string.

**First Amended Complaint**                                                                                        **Page 9**

      B.      Second, Darnell told Smith, "Let's go down to HR and clear this up."

      C.      Third, Darnell and Smith walked over to the HR office at the Paris Plant.

69.      Once at the HR office at the Paris Plant – it was still October 26, 2017 -- Smith told Ms. Melissa Gregg and Ms. Gina Frew – about the string.

70.      Melissa Gregg and Gina Frew told Smith that yes, "there's an investigation."

71.      Melissa Gregg and Gina Frew then told Smith that they had set Smith up to do a video interview on the following day (Friday, October 27, 2017) at noon.

72.      After that, Melissa Gregg and Gina Frew both told Smith, "It's not a big deal."

73.      Melissa Gregg and Gina Frew both advised Smith to "just tell her [*i.e.,* the interviewer] the same thing you told us."

74.      Smith went to the HR conference room at noon on Friday, October 27, 2017, as instructed.

      A.      Gina Frew was also present in person in the HR conference room.

      B.      Nobody other than Smith and Gina Frew were present in person in the HR conference room.

75.      A female Smith had never seen before appeared on a television screen in the HR conference room. She was there to do a video interview of Smith.

      A.      The name of the person who appeared on the television screen was Ms. Vida Bottom.

      B.      KC avers it no longer employs Ms. Vida Bottom. *See Defendant Kimberly-Clark Corp.'s Initial Disclosures,* served on May 24, 2018, at p. 2 (referring to Bottom as an individual "who was **formerly employed** by Kimberly-Clark")(emphasis added).

      C.      On October 27, 2017 KC did not assign Bottom to the Paris Plant.

D.      At no time during October 2017 was Bottom ever assigned to the Paris Plant.

76.      The video interview lasted about thirty minutes.

77.      KC recorded the video interview – either audio, video, or both.

78.      KC has preserved the video interview – either audio, video, or both.

79.      During this video interview, Bottom identified herself to Smith as the person who was in charge of fixing "Paris's racism problem." Bottom used those exact words.

80.      During this video interview, Bottom never asked Smith about any string.

81.      During this video interview, Bottom never asked Smith about any of the events that took place around midnight on Friday, October 13, 2017, at the back, a/k/a "fluff end" of the machine at P6 of the Paris Plant.

82.      During this video interview, Bottom never asked Smith about any communications that Smith may have had with Alyssa around midnight on Friday, October 13, 2017, at the back, a/k/a "fluff end" of the machine at P6 of the Paris Plant.

83.      During this video interview, Bottom never told Smith if KC had kept the supposed "noose" or where this "noose" even was located at the time of this interview, *i.e.,* October 27, 2017.

84.      During this video interview, Bottom took no steps to confirm or corroborate that the "noose" she was supposedly investigating was in fact made by Smith.

85.      During this video interview, Bottom room never showed Smith any "noose."

86.      During this video interview, Bottom never showed Smith any photos of any "noose."

87.      During this video interview, Bottom never showed Smith any photos of any

**First Amended Complaint**                                                                **Page 11**

"noose" of any kind.

88.     During this video interview, Bottom never told Smith if this interview, or any part of it, was or was not being recorded.

89.     During this video interview, Bottom did mention something that she called a "no knot" policy.

90.     On the afternoon of November 3, 2017, KC was unaware of Smith suffering from any physical disability that would render him unfit for the position of APO at KC.

91.     On the afternoon of November 3, 2017, KC was unaware of Smith suffering from any loss of a necessary professional license that would render him unfit for the position of APO at KC.

92.     On the afternoon of November 3, 2017, KC was unaware of Smith suffering from any occurrence that rendered him unfit to perform any job tasks of the employment position of APO at KC.

93.     On the afternoon of Friday, November 3, 2017, KC employed Mr. Greg Smith.

    A.     On this day KC assigned Greg Smith to the Paris Plant.

    B.     On this day KC assigned to Greg Smith the job title "Production Manager."

    C.     On this day KC empowered Greg Smith with the authority to take tangible employment actions against multiple employees at the Paris Plant.

    D.     On this day KC empowered Greg Smith with the authority to take tangible employment actions against Plaintiff Larry Smith.

94.     On the afternoon of Friday, November 3, 2017, Greg Smith made a telephone call to the Plaintiff, Larry Smith.

    A.     Greg Smith used a landline at the Paris Plant to make this call to Plaintiff

Larry Smith.

      B.     Greg Smith dialed Larry Smith's cell phone.

95.     Plaintiff Larry Smith took the telephone call from Greg Smith referenced in paragraph 94 *supra*.

96.     The following took place during the telephone call referenced in paragraphs 94 and 95 *supra*:

      A.     Greg Smith identified himself to Larry Smith.

      B.     Greg Smith then advised Larry Smith that Ms. Shana Barton from HR was also present on the call.

      (1)     On this day KC employed Barton as a "Senior Human Resources Manager."

      (2)     On this day KC assigned Barton to the Paris Plant.

      C.     After subpart "B," Greg Smith told Larry Smith, that "after investigating your case," KC had "decided to terminate your employment."

      D.     After subpart "C," Greg Smith advised Larry Smith that KC's reason for terminating Larry's employment was "***leaving a racist symbol for public display***."

      (1)     KC's stated reason is both false and offensive. Smith did not make "a racist symbol." Rather, Smith was trying to fix a fan at the request of a coworker (Alyssa) – who, again, is not white or Caucasian.

      E.     During the call Greg Smith identified no reason(s) for firing Larry Smith other than the one quoted in subpart "D."

      F.     After subpart "E," Greg Smith turned the call over to Barton.

      G.     Barton advised Plaintiff Larry Smith that KC would mail to Smith the

**First Amended Complaint**                                                          **Page 13**

contents of the locker that Smith was using in at the Paris Plant.

      (1)     KC forbade Smith from entering the premises of the Paris Plant at any point in the future.

      (2)     As of the filing of this amended pleading, and notwithstanding Barton's representation to him referenced in subpart "G," Smith has never received the personal effects that he stored in the locker KC had assigned to him at the Paris Plant.

      (3)     KC has never bothered to transmit, or cause to transmit, to Smith the personal effects that Smith stored in the locker that KC had assigned to him at the Paris Plant.

      (4)     In contravention of KC's policies, practices, and/or representations, KC has never transmitted to Smith, or caused to be transmitted to Smith, the personal effects that Smith stored in the locker that KC had assigned to him at the Paris Plant.

97.     KC replaced Smith with an individual named Mr. Michael Booker.

     A.     According to KC's records, Booker's race is not "White."

     B.     According to KC's records, Booker's race is not "Caucasian."

     C.     According to KC's records, Booker's race is Black.

     D.     According to KC's records, Booker's race is African-American.

98.     KC filled the employment position previously held by Smith with Mr. Michael Booker.

99.     KC required Booker to perform many of the essential job functions that it had previously required Smith to perform.

100.     As of November 3, 2017, Alyssa was still working at KC.

101.     KC currently employs Mr. Jerry Garvin as a Safety Manager.

     A.     KC employed Garvin as Safety Manager on November 3, 2017.

B.      KC employed Garvin on November 3, 2017.

C.      On November 3, 2017, KC empowered Mr. Greg Smith with the authority to take tangible employment actions against Garvin.

102.    KC discovered that Garvin engaged in a sexual encounter that took place on the premises of the Paris Plant.

A.      KC did not discharge Garvin for this.

B.      KC did not discipline Garvin for this.

C.      According to KC's records, Garvin's race is black.

D.      According to KC's records, Garvin's race is African-American.

E.      According to KC's records, Garvin's race is not white or Caucasian.

F.      This sexual encounter took place while Greg Smith was Production Manager at the Paris Plant.

103.    KC currently employs Ms. Regina Fort as an operation stand leader ("OSL").

A.      On November 3, 2017, KC employed Fort as an OSL.

B.      On November 3, 2017, KC empowered Mr. Greg Smith with the authority to take tangible employment actions against Fort.

C.      KC empowered Greg Smith with the authority to take tangible employment actions against Ford, and KC empowered Smith with this authority at all times from November 3, 2017 through the end of Greg Smith's employment with KC.

104.    Fort has had attendance problems during her employment with KC at the Paris Plant.

A.      These attendance problems took place, in whole or in part, while Mr. Greg Smith was Production Manager at the Paris Plant.

**First Amended Complaint**                                                                    **Page 15**

105.     Fort has made production errors, *i.e.,* she has allowed KC machines at the Paris
Plant to make subpar quality product.

        A.      These production errors took place, in whole or in part, while Mr. Greg
Smith was Production Manager at the Paris Plant.

        B.      According to KC's records, Fort's race is black.

        D.      According to KC's records, Fort's race is African-American.

        E.      According to KC's records, Fort's race is not White or Caucasian.

106.     KC advised the Texas Workforce Commission ("TWC") that it opposed Smith's
application for unemployment benefits.

107.     KC advised TWC that it opposed Smith's application for unemployment benefits.
In support, KC proffered the following explanation to TWC as to why it had fired Smith – "not
completing job duties and tasks."

108.     KC advised TWC that it opposed Smith's application for unemployment benefits.
In support, KC proffered the following explanation to TWC as to why it had fired Smith – "not
completing job duties and tasks." KC proffered to TWC no other reason as to why it had decided
to fire Smith.

109.     KC advised TWC that it opposed Smith's application for unemployment benefits.
In support, KC proffered the following explanation to TWC as to why it had fired Smith – "not
completing job duties and tasks." KC made no mention to TWC about any "noose" or "racist
symbol."

110.     KC mailed to Smith what's commonly called a "COBRA letter."

111.     In the letter referenced in the immediately preceding paragraph, KC stated that
Smith was eligible for continuing coverage of his health insurance so long as he paid a certain

**First Amended Complaint**                                                                                  **Page 16**

premium.

112.    On December 15, 2017, Smith signed charge of discrimination number 450-2018-00584 ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC").

      A.    In the Charge, Smith alleged that KC had discriminated against him because of his race.

      B.    EEOC filed the Charge on December 15, 2017.

113.    Later, but also on December 15, 2017, EEOC gave to Smith a form titled *Dismissal and Notice of Rights*. The form was signed by EEOC's District Director. In this form EEOC advised Smith, among other things, that he had ninety days within which to sue KC under the "federal law based on this [C]harge" – in this case, Title VII – failing which Smith's "right to sue based on this [C]harge will be lost."

      A.    On the lower left-hand corner of this form, EEOC represented that it "ccd" this form to Barton at KC.

114.    As a result of KC's conduct, including the foregoing, Smith has sustained financial losses, which he is continuing to sustain.

115.    As a result of KC's conduct, including the foregoing, Smith has suffered mental anguish, which he is continuing to suffer.

**Count One:**
**<u>Violation of Section 1981; Discrimination/Discharge</u>**

116.    Smith re-alleges and incorporates by reference all allegations set forth in paragraphs 11 through 115.

117.    A motivating factor in KC's decision to discharge Smith was Smith's race (white). This violates Section 1981.

118.    Smith's averments in the Material Facts portion of this pleading establish a *prima facie* violation of Section 1981 as follows:

A.      When KC advised Smith that he was fired, Smith was a member of protected class. See paragraph 24 *supra*.

B.      When KC advised Smith that it was terminating his employment, Smith was "qualified" for *prima facie* purposes. See paragraphs 90-92 *supra*.

C.      When KC advised Smith that it was terminating his employment, Smith suffered a cognizable adverse employment action. See paragraphs 27 & 96.C *supra*.

D.      KC replaced Smith someone who was not a member of the protected class identified in subpart A of this paragraph. See paragraphs 97-99 *supra*. Alternatively, KC treated Smith less favorably than other similarly situated employees who were outside the group identified in subpart A of this paragraph. See e.g., paragraphs 101-105 *supra*.

119.    Smith seeks all relief that is available to him under Section 1981. This includes but is not limited to the following categories:

A.      all wages and employment benefits, starting on the effective date of Smith's discharge, and ending on the date when a jury renders a verdict ("back pay").

B.      reinstatement, or, if that is found to be inappropriate, then a sum of money that is equal to all wages and benefits, starting from the date when a jury renders a verdict, and ending on the date when it is determined that Smith will be made whole ("front pay").

C.      compensatory damages, past and future, for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

D.      punitive damages, given the fact that KC engaged in such discriminatory

practices with malice or reckless indifference to Smith's federally-protected rights.

      E.      all permitted equitable relief.

      F.      all interest allowed by law, *e.g.,* pre-judgment and post-judgment.

      G.      a reasonable attorney's fee to the undersigned counsel as part of the costs.

      H.      reimbursement of expert fees as part of the undersigned counsel's attorney's

fee.

      I.      all other costs allowed by law.

**Alternative Claim -- Count Two:**
**Violation of Section 703 of Title VII; Discrimination/Discharge**

120.     Smith re-alleges and incorporates by reference all allegations set forth in paragraphs 11 through 115.

121.     This Count Two is an alternate claim to Count One. Specifically, Count Two is limited to the contingency where the Court or either of the parties rely on a "mixed motive" theory.

122.     A motivating factor in KC's decision to discharge Smith was Smith's race (white). This violates Section 703 of Title VII, 42 U.S.C. §2000e-2.

123.     Smith's averments in the Material Facts portion of this pleading establish a *prima facie* violation of Section 703 of Title VII as follows:

      A.      When KC advised Smith that he was fired, Smith was a member of protected class. See paragraph 24 *supra*.

      B.      When KC advised Smith that it was terminating his employment, Smith was "qualified" for *prima facie* purposes. See paragraphs 90-92 *supra.*

      C.      When KC advised Smith that it was terminating his employment, Smith suffered a cognizable adverse employment action. See paragraphs 27 & 96.C *supra*.

D.      KC replaced Smith someone who was not a member of the protected class identified in subpart A of this paragraph. See paragraphs 97-99 *supra*. Alternatively, KC treated Smith less favorably than other similarly situated employees who were outside the group identified in subpart A of this paragraph. See e.g., paragraphs 101-105 *supra.*

124.    Jones has satisfied the following conditions precedent to the filing of Count Two – *first*, Jones timely filed the Charge with EEOC; *second*, EEOC made the decision to give to Jones a "right to sue" letter; *third*, EEOC did give to Jones a "right to sue" letter; and *fourth,* Jones, by and through his attorney, filed this lawsuit within 90 days of Smith's receipt of EEOC's "right to sue" letter.

125.    Smith seeks all relief that is available to him under Section 703 of Title VII. This includes but is not limited to the following categories:

A.      all wages and employment benefits, starting on the effective date of Smith's discharge, and ending on the date when a jury renders a verdict ("back pay").

B.      reinstatement, or, if that is found to be inappropriate, then a sum of money that is equal to all wages and benefits, starting from the date when a jury renders a verdict, and ending on the date when it is determined that Smith will be made whole ("front pay").

C.      compensatory damages, past and future, for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

D.      punitive damages, given the fact that KC engaged in such discriminatory practices with malice or with reckless indifference to Smith's federally-protected rights.

E.      all permitted equitable relief.

F.      all interest allowed by law, *e.g.,* pre-judgment and post-judgment.

G.     a reasonable attorney's fee to the undersigned counsel as part of the costs.

H.     reimbursement of expert fees as part of the undersigned counsel's attorney's fee.

I.     all other costs allowed by law.

### Jury Demand

126.    Smith reiterates his demand for a jury on all issues so triable. *See* Fed. R. Civ. P. 38.

### Request for Relief

WHEREFORE, Plaintiff Larry James ("Jamie") Smith asks that he have final judgment against Defendant Kimberly-Clark Corporation as set forth hereinabove, and for all such other and further relief to which Smith is justly entitled.

Dated: July 12, 2018

Respectfully submitted,

/s/

By: _____

**Wade A. Forsman**
State Bar No. 07264257
P.O. Box 918
Sulphur Springs, TX 75483-0918
903.689.4144 Telephone-East Texas
972.499.4004 Telephone–Dallas/Fort Worth
903.689.7001 Facsimile
wade@forsmanlaw.com

**Attorney for Plaintiff**
**Larry James ("Jamie") Smith**

**First Amended Complaint**                                         **Page 21**

**Certificate of Service**

I certify that on Thursday, **July 12, 2018**, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or *pro se* parties of record electronically or by another manner authorized by FED. R. CIV. P. 5(b)(2).

/s/

_____

**Wade A. Forsman**